**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| MA CLEANING & LANDSCAPING DESIGN, INC., | * | |
| Plaintiff, | * | |
| v. | | Case No.: GJH-16-2720 |
| | * | |
| BANNEKER VENTURES, LLC, | * | |
| AND | * | |
| TRAVELERS CASULATY AND SURETY COMPANY OF AMERICA | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

In this contract dispute, Plaintiff MA Cleaning & Landscaping Design, Inc. ("MA"), a subcontractor of Defendant Banneker Ventures, LLC ("Banneker"), alleges that Banneker and Travelers Casualty and Surety Company of America ("Travelers") are liable for work performed by MA on a parking lot pursuant to a contract between Banneker and the General Services Administration ("GSA"). The parties have filed cross-motions for summary judgment, ECF Nos. 57, 59. A motions hearing was held on July 30, 2019. ECF No. 73. For the reasons that follow, Banneker's Motion for Summary Judgment, ECF No. 59, is granted and MA's Motion for Summary Judgment, ECF No. 57, is denied.

**I.     BACKGROUND**

On August 4, 2015, Banneker entered into a contract with GSA to construct a parking lot at the Social Security Administration. ECF No. 59-2 ¶ 1. Banneker hired MA as a subcontractor

1

to perform the excavation and fill for the project. ECF No. 58-7 at 22.[1] The subcontract specifically required MA to "remove all dirt from the proposed excavation site" and install the following materials "per plan:" a twelve-inch layer of sand, a fifteen-inch stone reservoir, a four-inch stone open grade base, and a one-and-a-half-inch stone setting bed. *Id*. For this work, MA was to be paid $225,384.50. *Id*. at 2.

The referenced plan was a set of drawings created by GSA. *See* ECF No. 58-6. The drawings depict the bottom of the excavation as declining from one side of the parking lot to the other in a series of steps, above which the sand, stone reservoir, stone open grade base, and stone setting bed were to be installed. *Id*. The drawings state in multiple places "bottom of stone base must be level." *Id*. Note six of the drawing, which appears in the bottom left corner, states, "The bottom of the sub-base shall be level with adjustments accomplished by stepping subgrade levels . . ." *Id*.

MA commenced execution of the contract, and, on November 18, 2015, Banneker was provided with the "revised cutsheets" for the project, which provided proposed elevations and fill for various points on the project. ECF No. 1-5. at 6. But on November 24, 2015, Banneker sent an email to MA stating that MA's crew did "not understand how to perform the . . . excavation." ECF No. 59-7. MA was attempting to cut the bottom of the excavation on a slope, and the Banneker Superintendent refused to allow them to do so. *Id*. MA asked Banneker to submit a Request for Information ("RFI") to GSA, who had created the drawings, and Banneker did so on December 3, 2015, seeking the elevations of the various steps in the drawings. ECF No. 58-8 at 1. GSA provided the elevations and, on Wednesday, December 9, 2015, Banneker submitted another RFI to GSA, explaining that MA had taken the position that the stepped elevations

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

required, in certain areas, from 36 inches to 48 inches of sand to be installed—far in excess of the 12 inches of sand listed in the subcontract—and asking for advice on how to proceed. ECF No. 58-9. The RFI also stated that "there is a cost associated with the additional material." *Id*. On the same day, Banneker told MA not to wait for a response from GSA, as it could not expect to get an approval for the "additional material" by the following Monday. ECF No. 58-10. Thus, Banneker directed MA to "begin the fill given the contract and costs that are already in place," and warned MA that if it refused to begin the infill within the next five days, it would cause the project to fall behind schedule and be in default of the contract. *Id*. Banneker informed MA that for every day it did not comply with the schedule, it incurred $350/day in liquidated damages, the cost of which would be shared with MA. ECF No. 58-11.

MA proceeded to install all of the material required by the revised cut sheets pursuant to the RFIs returned by GSA. ECF No. 58-12. But in response to MA's contentions that additional compensation was required to fulfill these obligations, Banneker sent a letter on December 15, 2015 explaining that MA had misinterpreted the contract drawings, and that Banneker maintained the expectation that MA would complete its work "per the contract drawings." ECF No. 59-3 at 2.

MA proceeded to hire iDesign Engineering, Inc. ("iDesign") to compare the original contract plan and the revised cut sheets, and on December 29, 2015, iDesign sent a letter to MA concluding that there were "discrepancies between the proposed elevations of the bottom of stone base on the [contract] and the proposed elevations on the cut sheets." ECF No. 58-13 at 3. On December 30, 2015, MA sent a Change Order Proposal to Banneker, stating that it had "incurred additional costs and expenses in fulfilling its contractual obligations under the Contract." ECF 58-12; *see also* ECF No. 58-7 at 7-8 (contract between Banneker and MA

providing for the submission of a change order if the subcontractor seeks a change in the price). But because Banneker agreed with GSA that the original drawings accurately depicted the required work for MA, it refused to submit the change order to GSA. *See* ECF No. 59-1 at 2. MA then sent a January 13, 2016 letter to GSA seeking reimbursement for the additional costs, which was denied. ECF No. 59-8. On this same date, iDesign sent a letter to MA answering its follow-up questions, in which it observed that MA's assumption that it would only excavate 38 inches for the entire area of the parking lot was a misreading of the original plans as to fill volume. ECF No. 59-4.

The contract between Banneker and MA contains several "pay-if-paid" clauses, which states that Banneker's obligations to make payments under the Agreement are subject to the "express condition precedent" of payment by the GSA. *See, e.g.,* ECF No. 58-7 at 3. The contract also contains a provision waiving its rights to any payments under the Miller Act. *Id.* at 19 ("Subcontract expressly waives any claim to . . . a basis for payment different from [Banneker's reimbursements from GSA under the contract], including but not limited to any contrary rights arising under 40 USC 270a and/or 270b.").

## II.     STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden is on the moving party to demonstrate that there exists no genuine dispute of material fact. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a

verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Under Fed. R. Civ. P. 56, a party must be able to put facts to be considered in support of or opposition to a motion for summary judgment in an admissible form. *See Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 398, 407 (D. Md. 2015).

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "The Court must deny both motions if it finds a genuine issue of material fact, 'but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.'" *Wallace v. Paulos*, No. DKC 2008-0251, 2009 WL 3216622, at *4 (D. Md. 2009) (citation omitted).

"The first step for a court asked to grant summary judgment based on a contract's interpretation is . . . to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *Wash. Metro Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). If the contract is unambiguous, the Court can interpret the contract as a matter of law. *Id*. If the contract is ambiguous, the court may examine extrinsic evidence of the parties' intent. *Id*. At that point, extrinsic evidence can either be dispositive as a matter of law or can leave genuine issues of material fact respecting the contract's proper interpretation. *Id*. In the latter case, summary judgment should be denied. *Id*. In sum, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitely resolved by reference to extrinsic evidence." *Id*.

## III. DISCUSSION

MA argues that it is entitled to summary judgment because, under the terms of the contract between it and Banneker, Banneker is liable for any excavation and fill performed by MA in excess of the quantities listed on Exhibit A of the subcontract as a matter of law. *See* ECF No. 58-7 at 22. Banneker disputes MA's interpretation of Exhibit A of the subcontract, and further contends that it is entitled to summary judgment due to the "pay-if-paid" clauses included in the subcontract.

    A.  <u>The Interpretation of the Contract</u>

Under Maryland law, a court should interpret a contract by determining the intent of the parties; the language of the contract is the primary source for identifying this intent. *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005). A contract is ambiguous if, "to a reasonably prudent person, the language used is susceptible of more than one meaning." *Bd. of Educ. of Charles Cty. v. Plymouth Rubber Co.*, 82 Md. App. 9, 26 (1990). If a contract is ambiguous, the court may consider extrinsic evidence "which sheds light on the intentions of the parties at the time of the execution of the contract." *Heat & Power Corp. v. Air Prods. & Chems, Inc.*, 320 Md. 584, 596-97 (1990).

The Court holds that the contract at issue here is ambiguous as to the amount of fill, but unambiguous as to the amount of excavation. Exhibit A to the agreement between Banneker and MA provides specific depths for each layer of stone and sand. Critically, the agreement never states, as Banneker asserts, that any of these are "minimum" depths. ECF No. 58-7 at 22. The contract also does not state that it is permissible for any of the layers to exceed the depths stated in the contract. *Id*. Indeed, the contract specification section twice states that subbase material should be placed both "in layers of specified thickness" and "in layers of uniform thickness." ECF No. 58-5 at 10. A reasonably prudent person would thus most likely read Exhibit A to

6

require an even installation of 32 ½″ of sand and stone. *See* ECF No. 58-7 at 22. However, Drawing C-103 suggests a different approach, as the base on which these layers are to be added is depicted as a series of declining steps, which means an even installation of sand and stone on top of the base resulting in an even layer upon which the parking lot could be paved would be impossible. *See* ECF No. 58-6. Furthermore, Note 6 on Drawing C-103 confirms that the sketch requires a stepped base. *Id*. This contradiction introduces an apparent ambiguity as to MA's responsibilities as to the amount of fill in the contract.

Exhibit A to the contract does not, however, offer any specificity as to the amount of dirt MA was responsible for excavating. The contract required MA to "remove all dirt" from the site without any depth limitation, so the stepped base layer does not conflict with the excavation requirements. Plaintiff contends that it is entitled to payment for any amount of excavation beyond the amount of fill detailed in Exhibit A to the contract. *See* ECF No. 58-7 at 22. But nothing in that section, or any other section identified by Plaintiff, either explicitly or implicitly limits the amount of excavation to that of the amount of fill detailed in the contract. Therefore, Plaintiff is not entitled to recover for its costs related to excavation.

Because the Court concludes that the amount of fill required by the contract is ambiguous, it must next determine whether the ambiguity is patent or latent. *United States v. Schlesinger*, 88 F. Supp. 2d 431, 441 (D. Md. 2000). A patent ambiguity is an "obvious omission, inconsistency, or discrepancy of significance" that is "so glaring as to raise a duty" to clarify the ambiguity before the parties become bound. *Id*. (internal quotations and citations omitted); *see also Mountain Home Contractors v. United States*, 192 Ct. Cl. 16, 22 (Cl. Ct. 1970) (stating that a plaintiff was not under a duty to seek clarification absent an "obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap"). "Failing to take such action

will bar the requested relief," regardless of the reasonableness of the nondrafter's interpretation. *Id.*

Here, there is a genuine dispute of material fact as to whether two provisions of the contract—the drawings and note clearly depicting and describing a stepped base, and the Exhibit A language describing even layers of fill—are in explicit contradiction with each other, such that the ambiguity is "obvious" or "glaring." A patent ambiguity must be determined "by what a reasonable contractor would have perceived in studying the bid packet." *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997). It is true that the ambiguity seems apparent on the face on the contract, but it is also notable that MA and Banneker negotiated Exhibit A, and neither seemed to have noticed the contradiction between Exhibit A and the drawings. There is insufficient evidence in the record to determine, as a matter of law, whether a reasonable contractor—not a reasonable lay person—would have concluded that Exhibit A and the drawings are in obvious conflict. Thus, the Court cannot determine, as a matter of law, whether the additional costs incurred by MA would be recoverable if the pay-if-paid clauses, discussed next, did not otherwise prevent recovery.

### B. Pay-if-Paid Clause

Banneker next contends that even if MA would otherwise be entitled to recover its additional costs, the contract with MA bars recovery due to the inclusion of several "pay-if-paid" clauses in the subcontract. These clauses make payment by GSA a "condition precedent" to payment by Banneker to MA. *See* ECF No. 58-7 at 3, 5, 19; *see also Gilbane Bldg. Co. v. Brisk Waterproofing Co.*, 86 Md. App. 21, 28-9 (Md. 1991) ("A provision that makes receipt of payment by the general contractor a condition precedent to its obligation to pay the subcontractor transfers from the general contractor to the subcontractor the credit risk of non-payment by the

8

owner for *any* reason (at least for any reason other than the general contractor's own fault), including insolvency of the owner."). The Court agrees. Because GSA has not, and will not, pay Banneker for the supplemental material, MA is barred from recovery.

MA claims that the Prevention Doctrine limits the application of the pay-if-paid clauses. Under the Prevention Doctrine, "if a promisor prevents or hinders fulfillment of a condition to [the promisee's] performance, the condition may be waived or excused." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000); *see also Griffith v. Scheungrab*, 219 Md. 27, 34 (Md. 1958) ("Where the cooperation of a promisee is necessary for the performance of a promise, there is a condition implied in fact that the cooperation will be given."). In short, if Banneker prevented MA from securing GSA's commitment to pay for the additional material, then the pay-if-paid clauses would no longer apply. *Moore Bros.*, 207 F.3d at 726 (holding that contractor's hindrance of fulfillment of pay-when-paid clause rendered performance of the condition precedent correctly waived).

However, the contract at issue here explicitly states that "Banneker is not obligated or required to pursue Subcontractor claims as against Owner if Banneker, in its *sole discretion*, after review of Subcontractor's claim, has deemed the claim to lack merit in whole or in part." ECF No. 58-7 at 5-6 (emphasis added). Banneker's refusal to pursue MA's claim is governed by this clause of the contract; its action complied with the terms of the contract, and therefore cannot be said to have prevented performance of the contract. Indeed, multiple courts have held that the Prevention Doctrine does not bar a promisor from taking action it was "permitted to take under either the express or implied terms of the contract." *Whitt v. Godwin*, 205 Va. 797, 800 (Va. 1965); *see also Godburne v. Meserve*, 130 Conn. 723, 726 (Conn. 1944) ("In order to amount to a prevention of performance by the adversary party, the conduct on the part of the party who is

9

alleged to have prevented performance must be wrongful, and, accordingly, in excess of his legal rights."); *Lansdowne v. Reihmann*, 124 S.W. 353, 354 (Ky. 1910) (holding that defendant could not "be held liable in damages for failing to do that which she was under no obligation to do"). The contract was not silent as to Banneker's dispute resolution obligations; to the contrary, it could not have more clearly stated that Banneker could exercise its discretion and not pursue MA's claim. That is what Banneker did when it determined that it agreed with GSA's interpretation of the drawings. Because the Prevention Doctrine does not apply, the pay-if-paid clause governs the contract and Banneker is entitled to summary judgment.

Lastly, MA contends that Travelers, as a surety, is not entitled to rely on the pay-if-paid clause in the subcontract to escape liability. *See United States f/u/b/o Arrow Elec. Sols., LLC v. Cont'l Cas. Co.*, No. ELH-16-3047, 2018 WL 4052246, at *9 (D. Md. 2018). However, a surety may "enforce a conditional payment clause in the subcontract if there is a clear and explicit waiver of Miller Act rights in the subcontract." *United States f/u/b/o Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 757 (D. Md. 2016). Here, in the same paragraph as one of the pay-if-paid clauses, the contract states that the subcontractor "expressly waives any claim to any payment in excess thereof or on a basis for payment different from the foregoing, including but not limited to any contrary rights arising under 40 USC 270a and/or 270b [the Miller Act]." ECF No. 58-7 at 19. Because MA "expressly" waived its rights under the Miller Act, Travelers is also entitled to Summary Judgment.

**IV.     CONCLUSION**

Plaintiff's Motion for Summary Judgment, ECF No. 57, is denied. Defendant's Motion for Summary Judgment, ECF No. 59, is granted. A separate Order shall issue.

Dated: August  8, 2019                                        /s/_____
                                                              GEORGE J. HAZEL
                                                              United States District Judge